IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs April 2, 2019

**STATE OF TENNESSEE v. TELVIN TOLES**

**Appeal from the Criminal Court for Shelby County**
No. 16-03687          Lee V. Coffee, Judge

_____

**No. W2018-01175-CCA-R3-CD**

_____

Defendant, Telvin Toles, was convicted by a Shelby County jury of one count of felony murder. On appeal, Defendant argues that the trial court erred by refusing to instruct the jury on self-defense and voluntary manslaughter; that the evidence is insufficient to support his conviction; that the trial court abused its discretion in ruling on the admissibility of certain photographs; that the trial court erred by allowing additional security officers to sit behind Defendant throughout the trial; that the trial court erred in overruling Defendant's objections to certain questions asked by the State; and that the trial court erred in allowing expert testimony when the full ballistics report had not been produced during discovery. Upon our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and ALAN E. GLENN, J., joined.

Josie S. Holland (on appeal); Jason Ballenger and Benjamin Israel (at trial), Memphis, Tennessee, for the appellant, Telvin Toles.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Assistant Attorney General; Amy P. Weirich, District Attorney General; Chris Lareau and Carla Taylor, Assistant District Attorney Generals, for the appellee, State of Tennessee.

**OPINION**

*Factual and Procedural Background*

On June 9, 2016, Defendant was indicted for one count of first degree felony murder and two counts of aggravated robbery. The murder charge was severed from the robbery charges and tried before a sequestered jury in April 2018.[1]

At trial, Tracy Simpson testified that the victim, Charles Davis, was 63 years old in December 2015. Though her mother and the victim were not legally married, Ms. Simpson considered the victim to be her stepfather because he had been with her mother for over 25 years. Ms. Simpson described the victim as "[v]ery calm, very patient, loving. Would do anything for anybody[.]" Ms. Simpson did not know the victim to be violent, to carry a gun, or to use drugs. Ms. Simpson stated that the victim was not the kind of person who would flag down a random car of people he did not know.

Juilie Juarez testified that on the afternoon of December 1, 2015, she was at home in her living room. She was watching television and using her cell phone when she heard a gunshot. She got up, looked out the front window, and saw three men fighting. Two men appeared to be holding down the third man and were beating him. One of the men was thin and was wearing a striped jacket. The other was "big, buff" and was wearing a black jacket. The victim appeared to be blocking blows from the assailants but was not hitting back. Ms. Juarez stated that one of the men stepped back and shot the victim three times. The two men then quickly got into a white Maxima and fled, leaving the victim on the ground. Ms. Juarez got her father's attention and called 911. Ms. Juarez testified that she recognized the victim from the neighborhood and that her father referred to him as a friend. Ms. Juarez had never seen the victim be mean or violent towards anyone. Ms. Juarez did not recall seeing the victim with a gun and testified that the shooter still had the gun when he got into the car. On cross-examination, Ms. Juarez agreed that she did not see the beginning of the fight, did not know who started it, and did not see who fired the first shot that initially got her attention. Ms. Juarez testified that she did not see either men take anything from the victim.

Pedro Juarez, Ms. Juarez's father, testified through an interpreter that he was at home on December 1, 2015. He was sitting at a table using his phone when he heard the first gunshot. His daughter went to the window and told him that people were fighting outside. Mr. Juarez ran to the window and saw three people fighting. The victim was on the ground. One of the men had a weapon, and he got up and shot the victim while the other man was holding the victim from behind. Mr. Juarez testified that the shooter then searched the victim's pockets before both assailants ran to the car and drove off. Mr. Juarez went outside to see if he could help the victim, but the victim could not talk. Mr. Juarez knew the victim because he used to walk around the neighborhood every day. Mr.

---

[1] The two counts of aggravated robbery are not subjects of this appeal and are not currently pending before this Court.

Juarez testified that the victim was friendly and that they often talked to each other, even though there was a language barrier. Mr. Juarez testified that he had never seen the victim be violent or carry a gun. On cross-examination, Mr. Juarez reiterated that one of the men shot the victim and then searched his pockets, though he agreed that he could not see if the man actually took anything. Mr. Juarez also agreed that he did not see the fight start or who started it, and he did not know to whom the gun belonged. Mr. Juarez admitted that he had been convicted of aggravated assault in 2015.

Officer Namika Johnson of the Memphis Police Department responded to a shots fired call and arrived on the scene around 4:25 p.m. She observed the victim lying face down on top of a storm drain. She rolled him over onto his back. Blood was coming from his mouth, but Officer Johnson could not see any gunshot wounds. The victim did not have a pulse, so Officer Johnson began performing CPR.

Sergeant Christopher Slaughter processed the scene after the victim had been taken to the hospital. He did not find any bullets or shell casings at the scene. A hat and an empty bottle were found on the ground near the storm drain, but Sergeant Slaughter did not remove the grate over the storm drain to search for more evidence. Sergeant Slaughter received from another officer the victim's personal property, which included the victim's wallet with his identification and social security card, a cross pendant, a lottery ticket, $12.74 in cash and coins, a cell phone, and a lanyard with two pocket knives.

Dr. Paul Benson, a forensic pathologist with the West Tennessee Regional Forensic Center, performed the autopsy of the victim. Dr. Benson testified that the victim's cause of death was multiple gunshot wounds. One gunshot wound entered the victim's right armpit, perforated his lung, injured his jugular vein and carotid artery, and fractured his ribs. The bullet did not exit and was able to be recovered from the victim's left shoulder. This wound was fatal. The victim had another gunshot entrance wound to his left buttock. The bullet hit his bladder and small intestine before exiting his right front pelvis. The victim had a third gunshot wound to his left thigh. The bullet penetrated less than an inch but was lost before the autopsy. Dr. Benson explained, "It may have fallen out if there was manipulation of the clothing somewhere between where the shooting occurred and the Medical Examiner's office." As to the depth of the wound, Dr. Benson explained that it "probably could be a ricochet from something, or it could have hit something else first before it hit the thigh. It only went in a very superficial amount[.]" The victim also had blunt force injuries to his head, knees, and hands. A toxicology report showed that the victim did not have drugs or alcohol in his system.

Kimyata McWilliams testified that Defendant rented a room from her for five or six months in 2015. Defendant drove a white Maxima. On December 1, 2015, Defendant came by the house a couple of times. The second occasion, sometime after the

murder, Ms. McWilliams noticed that someone else was driving Defendant's car. Defendant got out of the car, went across the street to the back of his mother's house, came back around to the front, handed something to a person in a red pickup truck, and then the person driving Defendant's car came back and picked him up. Ms. McWilliams knew the driver of the car as "P" and was able to identify him in a photographic lineup as Richard Leach, the indicted codefendant. Ms. McWilliams also identified Leach in a photograph from Facebook of "Telvin and his friend."

Defendant did not come back to Ms. McWilliams's house after December 1, but he called a couple of times about getting his child's coat that he had left after Ms. McWilliams had put him out of the house. After he did not show up, Defendant called and "said he had gotten into something, and couldn't come around there because he was hiding[.]" Defendant did not tell Ms. McWilliams what he had gotten into at first. Ms. McWilliams testified that Defendant later told her that someone had tried to rob him. Ms. McWilliams testified that she gave a statement to police on December 4, 2015, and that she "[b]asically" told the police the following:

> He called me, and he was telling me that he couldn't come to the house because he was hiding from police. He got into it with the old man. The old man tried to rob him. It was self-defense. And he had to get the old man - - I don't know. I know it was about some weed.

The State presented Ms. McWilliams her statement to refresh her recollection. Ms. McWilliams then testified that Defendant "said he f***ed up. The old man tried to rob him, so he had to get him." She then agreed that she told police that Defendant said, "I f***ed up. I tried to rob the old man in the neighborhood behind us." Ms. McWilliams explained, "Telvin told me that the old man tried to rob him, but I know the old man wasn't trying to rob him for no weed," so she "told the police that Telvin robbed the old man." When the police presented Ms. McWilliams with a photographic lineup, she wrote the following under Defendant's picture:

> This is Telvin Toles. He told me that he couldn't come get his child's coat because he was hiding out, staying away from the house. Police was looking for him and his car. That he f[***]ed up. And I said, "Why?" He said he got the old man by our neighborhood.

Ms. McWilliams clarified that she told the police both that Defendant stated he tried to rob the old man and that Defendant stated the old man tried to rob him. Ms. McWilliams believed that Defendant was the one who tried to rob the old man.

On cross-examination, Ms. McWilliams admitted that she had kicked Defendant out of the house because she was mad at him over something that had happened. She

- 4 -

admitted that she was still mad at Defendant when she talked to him on the phone. She stated that the first time she spoke to Defendant, he told her that "the old man approached him about a bag," that the old man tried to rob him, and that Defendant "f***ed up" and shot him; however, she "later found out what happened." On redirect examination, Ms. McWilliams testified that the "last time we had a conversation," Defendant told her, "I f***ed up. I tried to rob the old man in the neighborhood behind us, and I got him," so that is what she told the police. The trial court then clarified with Ms. McWilliams that she had actually spoken to Defendant twice. The first time he said that the old man tried to rob him, "but it was more to it, and that's how we ended up talking again, and everything came out." The second time Defendant called Ms. McWilliams, he told her "[e]xactly everything that happened" and admitted that he tried to rob the old man. On recross-examination, Ms. McWilliams testified that Defendant told her both versions of what happened. She admitted that she had previously been convicted of two counts of theft in 2011, though she could only remember one. On further re-direct examination, Ms. McWilliams testified that she had previously seen Defendant with guns, including a .9 millimeter and a .38 caliber.

Dr. Eric Warren testified that he was a former special agent forensic scientist for the Tennessee Bureau of Investigation (TBI), specializing in firearms identification and ballistics testing. Dr. Warren examined the bullet recovered from the victim and determined that it was consistent with a .38 special caliber. No gun was recovered to compare the bullet to, but Dr. Warren testified that such bullets could be fired from either .38 special or .357 Magnum firearms, the majority of which are revolvers. Because revolvers do not eject cartridge casings, it would not be unexpected for none to be recovered from the crime scene. Dr. Warren also testified with regard to gunshot residue. Even though Dr. Benson had collected samples from the victim's hands, Dr. Warren testified that the general policy of the TBI is not to test shooting victims for gunshot residue because "we know that they were associated with a firearm in some form or fashion," and gunshot residue testing "would not answer anything additional." Dr. Warren testified that in the case of two people struggling over a gun, he "wouldn't be surprised if [gunshot residue] was all over everybody, and [he] wouldn't be surprised if it was inconclusive on everybody" due to the sensitivity of the material and the way in which it is distributed when a gun is fired. On cross-examination, Dr. Warren agreed that .38 special is one of the most common types of revolvers. Dr. Warren testified that a gunshot residue report only indicates whether it is present, absent, or inconclusive rather than the amount of gunshot residue in the sample.

Richard Leach testified that he was indicted with Defendant for the first degree murder of the victim. After he was arrested on December 12, 2015, he gave a statement to police. Leach testified that he did not have an agreement with the State but that he understood that the State would be willing to offer him a plea to something less than first degree murder if he testified truthfully.

Leach testified that he had known Defendant since high school. On December 1, 2015, he and Defendant were hanging out. Around 4:00 p.m., they headed over to "Red's" house to get a shot for Defendant's dog. Leach was driving Defendant's white Maxima. When they got close to their destination, Defendant told Leach that someone had flagged them down. Even though Leach had not seen the man flagging them down, he pulled over, and Defendant got out of the car. Leach explained, "either dude want to buy some weed or whatever. But I wasn't really paying no attention. I was calling Red to let him know we was outside." Then, Leach heard Defendant calling his name. He looked up and saw Defendant and the victim "tussling or whatever." Leach got out of the car and saw Defendant and the victim on the ground, struggling over a gun. Defendant was kicking the victim to try to get him to let go of the gun. Leach tried to pull Defendant off of the victim. Defendant was able to get up with the gun. Leach recognized it as Defendant's gun, a black revolver, which he had seen Defendant with earlier that day. The victim said, "I can't die like this." Leach told Defendant, "Let him live," and told Defendant to come back to the car with him. Defendant said, "Naw. He tried to shoot me," then "upped [the gun] and shot him." Leach heard three gunshots. Defendant got back into the car, and they drove back to his neighborhood. Leach asked Defendant why he shot the victim, and Defendant responded, "Man, he tried to shoot me." Defendant then gave the gun to a person Leach did not know.

On cross-examination, Leach denied that he was hoping for a deal and stated that he was "just going to tell what happened." At the time Leach gave his statement to police, he knew he was being investigated for this murder and that he needed to "separate" himself from the situation. He testified that he signed the statement at 1:52 a.m., agreeing that he had been in the interrogation room for "quite some time" and that he was tired and ready to go home, but he denied that he told the police "whatever [he] thought [he] had to tell them to go." Leach testified that when the victim flagged them down, he pulled over and parked on the street in front of "Dirty Red's" house, which was their original destination. Defendant got out of the car and started talking to the victim, whom Leach did not know. However, Leach was not paying attention to Defendant's interaction with the victim until they started fighting and Defendant called for help. Leach stated that he was trying to break up the fight and to prevent anyone from getting shot. Leach denied that he or Defendant took anything from the victim. Leach agreed that Defendant told him after the fact that the victim tried to shoot him. Leach admitted talking to another inmate while waiting for a court appearance but denied saying that he was going to testify against Defendant because "Dirty Red" told him to put it all on Defendant.[2]

---

[2] Defendant attempted to present the testimony of Michael Tillman, who testified that he had a pending first degree murder charge and had met Leach at the courthouse the week before trial. However, the State objected on the basis of hearsay as to any prior inconsistent statements by Leach, and no further testimony was elicited from this witness.

Defendant was arrested on December 9, 2015. Officer Jacob Minor, who participated in serving the arrest warrant, testified that the police went to an address provided by the homicide investigators and were given permission to enter the apartment by a female. Defendant was found hiding behind the bed in the master bedroom. Officer Minor agreed on cross-examination that Defendant was laying or crouching beside the bed, not under the bed, and that Defendant did not attempt to run when the officers entered.

Defendant testified that he was 27 years old, was born in Memphis, had graduated high school and attended a few months of college, and had children. Defendant stated that he wanted to "tell my side of the story and what really happened." Defendant admitted that he sold marijuana for a living. Defendant testified that on December 1, 2015, around 4:00 p.m., he and Codefendant Leach went to "Dirty Red's" house and parked in the street. Defendant went to get his dog out of the car when a man standing in "Dirty Red's" driveway yelled out and asked Defendant if he had any "weed." The man asked Defendant for 2 grams, so Defendant went to the passenger side of the car to get the marijuana and a scale. Defendant weighed out the marijuana, bagged it in two separate bags, and then went to go meet the man in the street. As Defendant got close, the man "tried to up a gun." Defendant explained,

> Before he could up the gun all the way, I grabbed his hand. . . . [A]t the same time, I pushed it, and it went off. I put my other hand on it so he - - to prevent him from trying to aim the gun back at me, I had both hands on the gun.

Both Defendant and the man fell to the ground. Defendant called out to Leach for help. Leach jumped on top of Defendant, and Defendant "could barely move." Defendant told Leach to get the gun because he had to let go. Defendant got up and "started kicking and hitting the guy, telling him to let go of the gun. He wouldn't let go of the gun." Defendant had to pry the man's fingers off of the gun. Once Defendant had control of the gun, he backed up, told Leach to watch out, and shot three or four times. Defendant testified that he then tossed the gun and got back into the car.

Defendant testified that he was scared and his adrenaline was rushing, even after he got control of the gun. Defendant claimed that he was trying to protect himself and trying to prevent the man from shooting him. Defendant did not recall either the man or Leach saying anything. Defendant did not know what happened to the bags of marijuana because everything happened so quickly and he was focused on the gun, which he identified as a black revolver. Defendant denied going through the man's pockets or demanding anything from him.

- 7 -

After the shooting, Defendant and Leach drove to Defendant's mother's neighborhood. Defendant testified that he ran from the scene because he was scared and because he knew he was a convicted felon with drugs and a gun in the car. Defendant denied that he ever took his gun out of the car. When Defendant spoke to Ms. McWilliams a few days later about picking up his child's jacket, she told him that the police were looking for him. He told her, "A couple of days ago, a man tried to rob me, and I killed him." Defendant denied having a second conversation with Ms. McWilliams or changing his story and saying that he tried to rob the man. Defendant admitted that he did not know the victim and had never sold marijuana to him before, but he lived around the corner and occasionally sold marijuana to strangers.

On cross-examination, Defendant admitted that he had convictions for misdemeanor theft, felony coercion of a witness, and felon in possession of a handgun. Defendant testified that when he gave a statement to the police on December 10, 2015, he told them that "[e]verything that happened that day should be on the ground" because the marijuana was dropped on the ground during the struggle, and he tossed the gun before getting into the car. Defendant told the police that he did not own any weapons because he was a convicted felon, but they did not specifically ask if he had a gun with him that day. Defendant admitted that he carried a gun "[m]ostly" every day. Defendant told police that the victim asked if he had drugs and that he responded he had "loud," also known as "kush." Defendant testified that as he approached the victim with the marijuana, the victim raised the gun with this right hand when Defendant came within reach. Defendant put both his hands on the gun before the victim could raise it "all the way up." When Leach jumped in to help, Defendant was able to get one of his hands free while Leach and the victim struggled over the gun. Defendant picked up their hands and tried to loosen the victim's grip on the gun. Defendant was hitting and kicking the victim, telling him to let go of the gun. Defendant was eventually able to get control of the gun by prying the victim's fingers off of it. On redirect examination, Defendant testified that he could not recall if the victim was larger or smaller than him but that he was slim in December 2015 and had gained roughly 40 to 50 pounds since then.

At the conclusion of the proof, the jury convicted Defendant as charged of first degree murder, and the trial court imposed an automatic sentence of life in prison. On May 17, 2018, Defendant filed a motion for new trial, which was denied by the trial court on May 23, 2018. Defendant filed a timely notice of appeal.

*Analysis*

On appeal, Defendant argues that the trial court erred by refusing to instruct the jury on self-defense and on voluntary manslaughter as a lesser-included offense of felony murder; that the evidence is insufficient to support his conviction for felony murder; that the trial court abused its discretion in ruling on the admissibility of photographs depicting

Defendant and the victim; that the trial court erred by allowing additional security officers to sit behind Defendant throughout the trial; that the trial court erred in overruling Defendant's objections to questions asked by the State regarding Codefendant Leach's credibility and the victim's character for peacefulness; and that the trial court erred in allowing Dr. Warren to testify even though his full ballistics report had not been produced during discovery. We shall address each issue in turn.

## I. Jury Instructions

A defendant in a criminal case "has a right to a correct and complete charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000). Thus, "[t]he trial court has the duty to provide a complete charge of the law applicable to the facts of a case." *State v. James*, 315 S.W.3d 440, 446 (Tenn. 2010). "When called upon to review the adequacy of a particular jury instruction, reviewing courts should view the instruction in the context of the charge as a whole." *State v. Clark*, 452 S.W.3d 268, 295 (Tenn. 2014). A jury instruction is considered prejudicially erroneous only "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." *James*, 315 S.W.3d at 446 (quoting *State v. Hodges*, 944 S.W.2d 346, 352 (Tenn. 1997)). Because the propriety of jury instructions is a mixed question of law and fact, the standard of review is de novo with no presumption of correctness. *State v. Smiley*, 38 S.W.3d 521, 524 (Tenn. 2001).

## A. Self-Defense

Defendant made an oral motion for a jury instruction on self-defense both at the conclusion of the State's case-in-chief and at the close of all proof as well as submitted a written motion. The trial court found that self-defense had not been fairly raised by the proof. The trial court determined that Defendant was engaged in illegal activity because he was "selling drugs with a gun." The trial court explained that based on its reading of *State v. Perrier*, 536 S.W.3d 388 (Tenn. 2017), once the court made the threshold determination that Defendant was engaged in unlawful activity, "self-defense is not something . . . that this [c]ourt can charge." Additionally, the trial court found that "even if [self-defense] were applicable," there was no evidence that the victim posed an imminent threat of death or serious bodily injury once Defendant had possession of the gun.

> If Mr. Davis was at any point threatening the unlawful use of deadly force against this Defendant, at the time Mr. Davis was shot and killed, Mr. Davis was not in a position to have this Defendant to reasonably fear an imminent danger of death or serious bodily injury, because there simply

was no threat coming from Charles Davis at the time the Defendant allegedly stepped back and fired multiple shots at Mr. Davis.

The trial court found that according to Defendant's own testimony, "he stepped back and fired several shots at an unarmed man."

The trial court's duty to fully instruct the jury extends to general defenses, including self-defense. *State v. Hawkins*, 406 S.W.3d 121, 128 (Tenn. 2013). A defendant is entitled to an instruction on self-defense if it is fairly raised by the evidence. *Myers v. State*, 206 S.W.2d 30, 32 (Tenn. 1947). "In determining whether a defense instruction is raised by the evidence, the court must examine the evidence in the light most favorable to the defendant to determine whether there is evidence that reasonable minds could accept as to that defense." *State v. Sims*, 45 S.W.3d 1, 9 (Tenn. 2001). The proof necessary to fairly raise self-defense is less than a preponderance of the evidence. *Hawkins*, 406 S.W.3d at 129. If the defense is fairly raised by admissible evidence, "the burden shifts to the prosecution to prove beyond a reasonable doubt that the defense does not apply," *id.*, and the issue of whether a defendant acted in self-defense becomes a factual determination to be made by the jury, *State v. Echols*, 382 S.W.3d 266, 283 (Tenn. 2012). However, such a defense is not submitted to the jury unless it is fairly raised by the proof. T.C.A. § 39-11-203(c).

As relevant to this case, Tennessee Code Annotated section 39-11-611(b)(2) provides that:

a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:

(A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;

(B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and

(C) The belief of danger is founded upon reasonable grounds.

While the trial court was correct that that the Tennessee Supreme Court held in *Perrier* that the trial court must make a threshold determination whether a defendant was "engaged in unlawful activity" as part of its decision whether to charge the jury with self-defense, *see* 536 S.W.3d at 403, it erred in concluding that engaging in unlawful activity was a complete bar to self-defense. The *Perrier* court actually held that "the phrase 'not engaged in unlawful activity' is a condition on a person's statutory privilege not to

- 10 -

retreat." *Id.* at 401. "[A] duty to retreat does not mean that a person cannot defend herself or himself." *Id.* at 404. Instead, consistent with the common law duty to retreat, a defendant engaged in unlawful activity "'must have employed all means in his power, consistent with his own safety, to avoid danger and avert the necessity of'" using force. *Id.* (quoting *State v. McCray*, 512 S.W.2d 263, 265 (Tenn. 1974)).

Moreover, the trial court erred in considering the reasonableness of Defendant's belief that the victim posed an imminent threat of death or serious bodily injury. A person's belief that there is an imminent danger of death or serious bodily injury must "meet an objective standard of reasonableness to be justified." *State v. Bult*, 989 S.W.3d 730, 732 (Tenn. Crim. App. 1998). However, it is up to the jury with proper instructions, not the trial court, to determine "whether the defendant's belief in imminent danger was reasonable, whether the force used was reasonable, and whether the defendant was without fault." *State v. Pruitt*, 510 S.W.3d 398, 420 (Tenn. 2016) (quoting *State v. Renner*, 912 S.W.2d 701, 704 (Tenn. 1995)). Thus, whether "a defendant has a genuine, well-founded fear that he was in danger of death or great bodily harm," such that his use of force is justified, is a "matter for the jury to decide." *State v. Ivy*, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993) (internal citations omitted). "Reliance on self-defense is not limited to the exact moment of the assault [but] may be considered in connection with the entirety of the events leading to the assault." *Id.* (holding self-defense instruction warranted when there was testimony that victim assaulted defendant first, even though there was also testimony that defendant disarmed victim and immediately assaulted victim with his own weapon).

However, Defendant does not dispute that he was engaged in unlawful activity at the time he encountered the victim; thus, he had a duty to retreat before using deadly force under *Perrier*. Defendant was obligated to "employ[] all means in his power, consistent with his own safety, to avoid danger and avert the necessity of taking [the victim's] life." *Perrier*, 536 S.W.3d at 404 (internal quotation omitted). Regardless of who initiated the confrontation, once Defendant wrestled the gun away from the victim, he had ample opportunity to retreat but failed to do so. Thus, even in the light most favorable to the Defendant, there is no evidence that reasonable minds could accept that he attempted to retreat before using deadly force. *See State v. Michael Kevin Schipp*, No. M2016-01933-CCA-R3-CD, 2018 WL 1182791, at *4 (Tenn. Crim. App. Mar. 7, 2018), *perm. app. denied* (Tenn. June 6, 2018). Therefore, the trial court did not err in refusing to instruct the jury on self-defense.

### B. Voluntary Manslaughter

Defendant also requested that the trial court instruct the jury on voluntary manslaughter as a lesser-included offense of felony murder. A defendant's right to a complete and correct charge of the law "includes the right to jury instructions on each

and every lesser-included offense embraced within the charged offense(s) and supported by the proof." *State v. Thorpe*, 463 S.W.3d 851, 859 (Tenn. 2015) (quoting *State v. Davis*, 266 S.W.3d 896, 902 (Tenn. 2008)). Upon written request by either party, "the trial judge shall instruct the jury as to the law of each offense specifically identified in the request that is a lesser[-]included offense of the offense charged in the indictment[.]" T.C.A. § 40-18-110(a). The trial court must first determine whether an offense is a lesser-included offense and then must determine whether an instruction on the lesser-included offense is supported by the evidence. *State v. Page*, 184 S.W.3d 223, 228 (Tenn. 2006). The trial court should consider the evidence "in the light most favorable to the existence of the lesser[-]included offense without making any judgment on the credibility of such evidence." T.C.A. § 40-18-110(a). Upon review, this Court must determine "(1) whether the offense is a lesser included offense; (2) whether the evidence supports a lesser included offense instruction; and (3) whether the failure to give the instruction is harmless error." *State v. Howard*, 504 S.W.3d 260, 268 (Tenn. 2016) (citing *State v. Allen*, 69 S.W.3d 181, 187 (Tenn. 2002)).

Lesser-included offenses are defined by Tennessee Code Annotated sections 40-18-110(f) and (g), which codified parts (a) and (c) of the test promulgated by the Tennessee Supreme Court in *State v. Burns*, 6 S.W.3d 453, 466-67 (Tenn. 1999). Voluntary manslaughter does not qualify as a lesser-included offense of felony murder under subsection (f)(1) because it contains an element that is not "included within the statutory elements of the offense charged." *Compare* T.C.A. § 39-13-202(a)(2) (defining felony murder as "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery") *with* T.C.A. § 39-13-211(a) (defining voluntary manslaughter as "the intentional or knowing killing of another in a state of passion produced by adequate provocation"). Moreover, subsection (g)(2) specifically defines voluntary manslaughter as a lesser-included offense of premeditated first degree murder, implying that it is not a lesser-included offense of first degree felony murder.[3] *Cf.* T.C.A. § 40-18-110(g)(1) (stating "[s]econd degree murder is a lesser included offense of first degree murder as defined in § 39-13-202," which includes felony murder).

However, the Tennessee Supreme Court has recently held that the 2009 additions of subsections (f) and (g) to Tennessee Code Annotated section 40-18-110 did not abrogate part (b) of the *Burns* test. *See Howard*, 504 S.W.3d at 270. Under part (b), an offense is a lesser-included offense if it differs from the greater offense only in that it contains a statutory element establishing a different mental state indicating a lesser kind of culpability or a less serious risk of harm. *Burns*, 6 S.W.3d at 466-67. In *State v. Ely*, the Tennessee Supreme Court considered whether other grades of homicide are lesser-

---

[3] The trial court determined that voluntary manslaughter was not a lesser-included offense of felony murder on this basis, relying on *State v. Cordricus Arnold*, No. W2015-00702-CCA-R3-CD, 2016 WL 1705210, at *5 (Tenn. Crim. App. Apr. 26, 2016), *perm. app. denied* (Tenn. Oct. 24, 2016). However, that case was designated not for citation by the Tennessee Supreme Court.

included offenses of felony murder under the *Burns* test but did not specifically consider voluntary manslaughter. 48 S.W.3d 710, 720 (Tenn. 2001). However, *Ely* did recognize that felony murder is considered equally culpable as premeditated murder, even though it has a different mental state, because they are contained within the same first degree murder statute. *Id.* at 721. Further, in *State v. Dominy*, which was filed simultaneously with *Burns*, the Tennessee Supreme Court noted "that the 'passion' language in the definition of voluntary manslaughter simply reflects a less culpable mental state than required for first or second degree murder." 6 S.W.3d 472, 477 n.9 (Tenn. 1999). Citing the *Burns* test, *Dominy* noted that "voluntary manslaughter is a lesser-included offense of first . . . degree murder," without specifying either premeditated or felony murder. *Id.* Moreover, several unpublished opinions of this Court have held that voluntary manslaughter is a lesser-included offense of felony murder under part (b) of the *Burns* test. *See State v. Edward Joseph Benesch II*, No. M2015-02124-CCA-R3-CD, 2017 WL 3670196, at *16 (Tenn. Crim. App. Aug. 25, 2017), *no perm. app. filed*; *State v. Devin Banks*, No. W2005-02213-CCA-R3-DD, 2007 WL 1966039, at *32 (Tenn. Crim. App. July 6, 2007), *aff'd as corrected*, 271 S.W.3d 90 (Tenn. 2008); *State v. Marlon Marktavias Fitzgerald*, No. W2001-03096-CCA-R3-CD, 2003 WL 261940, at *9 (Tenn. Crim. App. Feb. 7, 2003), *perm. app. denied* (Tenn. July 7, 2003); *State v. Alfonzo Williams*, W2001-00452-CCA-R3-CD, 2002 WL 1482695, at *5 (Tenn. Crim. App. Mar. 15, 2002), *perm. app. denied* (Tenn. Sept. 23, 2002); *State v. Daniel Wade Wilson*, No. E2000-01885-CCA-R3-CD, 2001 WL 872442, at *14 (Tenn. Crim. App. Aug. 2, 2001), *perm. app. denied* (Tenn. Mar. 11, 2002).

Thus, the trial court erred in determining that voluntary manslaughter was not a lesser-included offense of felony murder. Moreover, taking the evidence in the light most favorable to the existence of the lesser-included offense without judging its credibility, *see* T.C.A. § 40-18-110(a), an instruction on voluntary manslaughter was supported by the proof. Defendant testified that the victim threatened him with a gun, which required both him and Leach to engage in an extended physical altercation with the victim for control of the gun. Leach testified that Defendant stated several times that the victim tried to shoot him. This could be deemed adequate provocation that would cause Defendant to act in a state of passion when he shot the victim. Thus, the trial court erred in failing to instruct the jury on voluntary manslaughter.

Because the right to jury instructions on all lesser-included offenses supported by the evidence is constitutional in nature, the State bears the burden of showing that the error was harmless beyond a reasonable doubt. *State v. Locke*, 90 S.W.3d 663, 671 (Tenn. 2002). The jury in this case was instructed on the lesser-included offenses of second degree murder, reckless homicide, and criminally negligent homicide; yet, the jury convicted Defendant of the charged offense of felony murder. The supreme court has held that when a jury "find[s] the defendant guilty of the highest offense to the exclusion of the immediately lesser offense, second degree murder, the jury necessarily

- 13 -

rejected all other lesser offenses, including voluntary manslaughter." *State v. Williams*, 977 S.W.2d 101, 106 (Tenn. 1998). Thus, the trial court's failure to instruct the jury on voluntary manslaughter was harmless beyond a reasonable doubt. *Id.*

## II. Sufficiency of the Evidence

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. The relevant question is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The jury's verdict replaces the presumption of innocence with one of guilt; therefore, the burden is shifted onto the defendant to show that the evidence introduced at trial was insufficient to support such a verdict. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). The prosecution is entitled to the "'strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.'" *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Questions concerning the "'credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact.'" *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008)). "'A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory.'" *Reid*, 91 S.W.3d at 277 (quoting *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)). It is not the role of this Court to reweigh or reevaluate the evidence, nor to substitute our own inferences for those drawn from the evidence by the trier of fact. *Id.* The standard of review is the same whether the conviction is based upon direct evidence, circumstantial evidence, or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009).

Defendant was convicted of felony murder, which is "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery[.]" T.C.A. § 39-13-202(a)(2). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39-13-401(a). "In order for a killing to occur 'in the perpetration of' the felony, the killing must be 'done in pursuance of the unlawful act, and not collateral to it.'" *State v. Kiser*, 284 S.W.3d 227, 286 (Tenn. 2009) (quoting *Farmer v. State*, 296 S.W.2d 879, 883 (Tenn. 1956)). The only required mental state for felony murder is the intent to commit the underlying felony. T.C.A. § 39-13-202(b). The Tennessee Supreme Court has held that the "intent to commit the underlying felony must exist prior to or concurrent with the commission of the act causing the death of the victim," even if the actual killing occurs prior to the commission of the felony. *State v. Buggs*, 995 S.W.2d 102, 107 (Tenn. 1999). "Proof that such intent to commit the underlying felony existed before, or concurrent with, the act of killing is a

question of fact to be decided by the jury after consideration of all the facts and circumstances." *Id*. "[A] jury may reasonably infer from a defendant's actions immediately after a killing that the defendant had the intent to commit the felony prior to, or concurrent with, the killing." *Id*. at 108.

Defendant argues that the State failed to prove beyond a reasonable doubt that he committed or attempted to commit a robbery. Defendant points to testimony that the victim still had his wallet and some cash on his person, Ms. Juarez's testimony that she did not see the assailants take anything from the victim, Ms. McWilliams's testimony that Defendant told her that the altercation occurred over "some weed," and Defendant's own testimony that he did not attempt to take anything from the victim and only approached the victim believing he wanted to purchase marijuana. However, in the light most favorable to the State, the evidence shows that Defendant killed the victim during the attempted perpetration of a robbery. Even though Codefendant Leach was not paying attention to Defendant's initial interaction with the victim, he identified the gun they were struggling over as Defendant's. Mr. Juarez testified that he observed one of the assailants shoot the victim and then search through the victim's pockets. Ms. McWilliams testified that Defendant admitted to her several days later that he "tried to rob the old man." From this evidence, a jury could reasonably infer that Defendant intended to rob the victim at the time he shot and killed him. Defendant is not entitled to relief.

### III. Photographs

Defendant next contends that the trial court erred in ruling on the admissibility of certain photographs of Defendant and the victim. Specifically, Defendant complains that the trial court abused its discretion in admitting the photograph of Defendant and Codefendant Leach "that showed Mr. Leach flashing [a] gang sign while the [Defendant] stood beside him." Defendant also complains that the trial court abused its discretion in admitting a corpus photograph of the victim with his longtime girlfriend. Finally, Defendant argues that the trial court abused its discretion in excluding a photograph of Defendant and his young son.

The State responds that Defendant has waived the issue with respect to all three photographs for failure to cite to the record to show where he objected. Though the argument section of Defendant's appellate brief with respect to this issue does not include specific citations, the statement of the facts describes the introduction of each photograph, Defendant's basis for objection, and the trial court's ruling, all with citations to the relevant transcript volume and page numbers. Because Defendant's brief makes "appropriate references to the record" in support of this issue, *see* Tenn. Ct. Crim. App. R. 10(b), the issue is not waived due to an inadequate brief, and we will address it on the merits.

To be admissible, a photograph must be relevant to an issue at trial, and its probative value must outweigh its potential for unfair prejudice. *State v. Vann*, 976 S.W.2d 93, 102 (Tenn. 1998). Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. In considering whether photographs are relevant, trial courts must consider the questions of fact that the jury will have to consider in determining the accused's guilt, as well as other evidence that has been introduced during the course of the trial. *State v. Williamson*, 919 S.W.2d 69, 78 (Tenn. Crim. App. 1995). Relevant evidence is generally admissible, *see* Tenn. R. Evid. 402, but "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Unfair prejudice is generally defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *State v. Banks*, 564 S.W.2d 947, 951 (Tenn. 1978). The admissibility of photographs lies within the sound discretion of the trial court, and its ruling on the matter "will not be overturned on appeal except upon a clear showing of an abuse of discretion." *Id.* at 949. An abuse of discretion occurs when the trial court (1) applies an incorrect legal standard; (2) reaches an illogical or unreasonable decision; or (3) bases its decision on a clearly erroneous assessment of the evidence. *State v. Mangrum*, 403 S.W.3d 152, 166 (Tenn. 2013) (citing *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010)).

### A. Photograph of Defendant and Codefendant Leach

Prior to trial, Defendant filed a motion in limine requesting that any reference to Defendant's gang affiliation be excluded, which was provisionally granted by the trial court. Later, during the testimony of Ms. McWilliams, the State attempted to introduce a printout of two photographs from Facebook depicting Defendant and Codefendant Leach standing together with a dog. In the nearly identical side-by-side pictures, Leach has his right hand raised about chest high and is making a gesture with his thumb extended to the left and his fingers pointed down with his ring finger tucked back and his pointer finger crossed on top of his middle finger. Defense counsel objected on the basis that not only was the photograph cumulative with Ms. McWilliams's prior photographic lineup identifications but also that it was prejudicial because Leach's hand gesture could be interpreted as a gang sign. The trial court found that there was "nothing illegal about this picture" and that the jury had been told that the case had nothing to do with gangs. The trial court stated that the gesture looked like the "Horns" gesture made by the University of Texas Longhorns football team.[4] Defense counsel, citing his familiarity with the

---

[4] The "Horns" sign, often referred to as "Hook 'em Horns," is a hand gesture made by students, alumni, and fans of the University of Texas at Austin. "The gesture is meant to approximate the shape of

"Horns Down" sign,[5] disagreed with the trial court's interpretation based on the number of fingers extended. The prosecutor noted that it was not Defendant making the gesture. The trial court determined that the photograph was not prejudicial, stating that it would not "speculate that the jury might infer something when I've already told them that gangs and gang affiliation has absolutely nothing to do with this case."

During the motion for new trial hearing, the trial court noted that Defendant did not present the testimony of an expert witness to testify that the gesture was in fact a gang sign in order to be considered as a bad act under Rule 404(b). The trial court found that the picture did not identify Defendant as a member of a violent gang and that the State did not introduce any evidence indicating that Defendant was a member of a violent gang. The court found that the photograph was relevant not only to establish identity but also to show that Defendant and Leach have "associated with each other for a long, long period of time."

The first question we must determine on appeal is which Rule of Evidence applies, 403 or 404(b).[6] *See State v. James*, 81 S.W.3d 751, 758 (Tenn. 2002) (citing *State v. DuBose*, 953 S.W.2d 649, 655 (Tenn. 1997)). Defendant contends that the Facebook pictures implicate Tennessee Rule of Evidence 404(b) because Leach's hand gesture could have been interpreted by the jury as a gang sign. *See State v. Shasta Jackson*, No. E2014-01387-CCA-R3-CD, 2015 WL 6756318, at *9 (Tenn. Crim. App. Nov. 5, 2015) (holding that evidence of gang affiliation is character evidence subject to Rule 404(b)), *perm. app. denied* (Tenn. May 5, 2016). However, because the gesture in question is being made by Leach, regardless of whether it is a gang sign or some other innocent gesture, it does not directly implicate Defendant's character or propensity to commit the crime on trial. *See State v. Stevens*, 78 S.W.3d 817, 837 (Tenn. 2002) (quoting *DuBose*, 953 S.W.2d at 653) ("'Evidence of crimes, wrongs or acts, if relevant, [is] not excluded by Rule 404(b) if [the acts] were committed by a person other than the accused[.]'"). Therefore, so long as the picture was relevant, it would only need to be excluded if the

---

the head and horns of the UT mascot, the Texas Longhorn. . . . The sign is made by extending the index and pinky fingers while grasping the second and third fingers with the thumb." Hook 'em Horns, Wikipedia, https://en.wikipedia.org/wiki/Hook_%27em_Horns (last visited April 23, 2019).

[5] "A variant of the Horns, formed upside down with the thumb pointed outward, is often used by rivals of the Longhorns and is considered insulting, especially when performed by a player or coach of the team in question." *Id*.

[6] Under Rule 404(b), "[e]vidence of other crimes, wrongs, or acts" is inadmissible character evidence if offered to show a defendant's "action in conformity with [a] character trait" but may be admissible for other purposes, such as to prove identity, motive, or intent, if its probative value is not outweighed by its potential for unfair prejudice. *See also State v. Parton*, 694 S.W.2d 299, 654 (Tenn. 1997).

danger for unfair prejudice *substantially* outweighed its probative value. *See* Tenn. R. Evid. 403.

Defendant contends that the Facebook pictures "had no probative value beyond identity," which was not a material issue at trial because he admitted that he was the person who shot the victim. The State responds that the probative value of the pictures was not Defendant's identity, but Codefendant Leach's. The pictures were introduced during the testimony of Ms. McWilliams, who only knew Leach as "P." She was able to use the Facebook pictures to identify "Telvin and his friend." Thus, the pictures were relevant under Rule 401. Moreover, unlike the lineup identifications previously admitted into evidence during Ms. McWilliams's testimony, the Facebook pictures corroborated Leach's testimony that he and Defendant knew each other and spent time together; thus, they were not needlessly cumulative. As for potential prejudice, Defendant simply speculates that the jury might have interpreted the gesture as a gang sign, thereby "divert[ing] the minds of the jury to the improper and irrelevant consideration of gang affiliation." However, other than the gesture, the pictures contain none of the typical indicia of gang affiliation, such as guns, drugs, cash, or distinctive clothing. There was no testimony presented that either Leach or Defendant was in a gang or that the hand gesture was specifically indicative of gang membership. In fact, the trial court interpreted the gesture as being related to a football team. The State did not call attention to the gesture in its questioning of Ms. McWilliams or Leach or in its closing argument. Though a juror asked whether the case was gang related during voir dire, the trial court specifically instructed the jury that it was not. Defendant has not shown that the potential for unfair prejudice, if any existed at all, substantially outweighed the probative value of the Facebook pictures under Rule 403. Thus, the trial court did not abuse its discretion in admitting the Facebook pictures of Defendant and Leach.

## B. Photograph of Victim

During the testimony of Ms. Simpson, the State offered to introduce a photograph of the victim standing with his arm around with Ms. Simpson's mother, his longtime girlfriend. Defendant objected that the photograph was prejudicial because it tended to elicit sympathy from the jury. The State responded, and the trial court agreed, that the photograph depicted the victim as a whole person, was not overly sympathetic, and illustrated his relatively small stature.

Pursuant to the Victims' Bill of Rights, the State is allowed to admit in any homicide prosecution "an appropriate photograph of the victim while alive . . . to show the general appearance and condition of the victim while alive." T.C.A. § 40-38-103(c). The fact that the photograph includes another person with the victim does not necessarily render it unduly prejudicial. *See State v. Nesbit*, 978 S.W.2d 872, 901-02 (Tenn. 1998) (appendix) (holding trial court did not abuse its discretion in admitting photograph of

murder victim with her children). Even if the photograph is not relevant to a contested issue, the Tennessee Supreme Court has noted that "[g]enerally, photographs taken during the life of a victim are not so prejudicial as to warrant a new trial." *State v. Adams*, 405 S.W.3d 641, 657 (Tenn. 2013). The trial court did not abuse its discretion in admitting the photograph of the victim and his girlfriend.

### C. Photograph of Defendant and Son

Prior to Defendant's testimony, defense counsel indicated that he intended to introduce a picture of Defendant and his young son "taken a few months before the incident occurred." Defense counsel asserted that the picture was relevant to show Defendant's "actual stature at the time that he was arrested" because he was "much larger now." Defense counsel argued that because the State was allowed to introduce a corpus photograph of the victim standing with his girlfriend in order to show the victim's relative size, it would be "only fair" to allow Defendant to enter this photograph for a similar purpose. The prosecutor responded that the photograph of Defendant and Leach that had already been admitted into evidence showed Defendant's relative stature and that the only purpose of introducing a picture of Defendant holding his son's hand was to "inflam[e] the passions of the jury." The trial court excluded the photograph, finding that it was not relevant to any issue at trial. During the motion for new trial hearing, the trial court noted that defense counsel did not request to admit the photograph with the child cropped out. The trial court also found that because the issue of self-defense had not been fairly raised and presented to the jury, the issue of Defendant's relative stature was not relevant.

Though Tennessee courts follow a policy of liberality in the admission of photographs, *see Banks*, 564 S.W.2d at 949, a photograph must still be relevant to be admissible. *Id.*; Tenn. R. Evid. 402. The determination of whether evidence is relevant is within the discretion of the trial court. *See State v. Leath*, 744 S.W.2d 591, 593 (Tenn. Crim. App. 1987). Defendant has not established that the trial court abused its discretion in determining that the photograph of himself and his son was not relevant. Defendant's asserted purpose for introducing the photograph was to show his relative stature at the time of the incident since he had gained a significant amount of weight by the time of trial. However, the photograph depicted Defendant with a small child, which does little to show Defendant's stature in comparison to another adult. Moreover, the potential for unfair prejudice was high because the photograph depicted Defendant in a particularly sympathetic light, holding the hand of his son, who appeared to be no more than two or three years old. Even assuming *arguendo* that the trial court abused its discretion in excluding the photograph, Defendant has failed to show how this error affected the outcome of the trial to his prejudice in light of the overwhelming evidence of his guilt. *See id.* at 594 (citing Tenn. R. App. P. 36(b)). Defendant is not entitled to relief.

*IV. Courtroom Security*

As his next issue, Defendant contends that he was prejudiced by the presence of additional security officers who were allowed to sit directly behind him throughout the course of the trial. Prior to voir dire, defense counsel requested that the deputies who had escorted Defendant from the jail not remain in the courtroom while the jury was present. Defense counsel indicated that the reason for the escort related to threats directed at Codefendant Leach and were unnecessary when Leach was not present. The trial court stated that some of the "restrictions" that had been placed on Defendant pursuant to a previous court order[7] had been removed but that the deputies would remain in the courtroom:

> These are uniform[ed] deputies that are Shelby County Sheriff's deputies, who are dressed just like my deputies in the courtroom . . . . There's nothing about those deputies that would distinguish them other than they work as deputies for the Sheriff's office. And they're just providing security.
>
> The jury will not know that he's under escort or being - - having any other special precautions . . . . And this is just two additional deputies, and that does not create any inference of any prejudice to [Defendant] because there's six deputies in the courtroom instead of four.

At the beginning of voir dire, the trial court introduced the jury to the "deputies that provide security for the courtroom" and indicated that the jury might see "other deputies that will be in and out of the courtroom over the course of the trial." The trial court then explained:

> The deputies provide security. They make sure that the jurors, defendants, lawyers, court personnel, they make sure that everyone who is in this court is, in fact, safe and is secure. So those are the deputies that you'll see in and out of court. There will be four deputies that will be allowed to speak to you. The other deputies that you might see in court will not even be able to say anything to you at all.

During the motion for new trial hearing, defense counsel indicated that security guards were seated behind Defendant during the entire trial. Defense counsel noted that the State had not alleged and the trial court had not made any specific findings regarding any threats posed by Defendant to the courtroom. The trial court noted that Defendant was dressed in civilian clothes and was not restrained other than an "ankle stun cuff,

---

[7] This order is not in the record on appeal.

about the size of a GPS monitor that courts place on folks when they are on bond" but that was not visible to the jury.[8]  The trial court noted that there were several Shelby County Sheriff's deputies in the courtroom and that nothing distinguished those who normally worked in the courtroom from those who worked for the jail.  The trial court also noted that the reason for the security related to threats that had allegedly been communicated to Leach from Defendant or his family, but the court did not hold a hearing on those allegations because "if I did, and I found that those things were true, then the Court would have to take additional - - would have to impose additional punishment in this case."  The trial court found that there was "absolutely nothing" about the presence of additional law enforcement officers in the courtroom "that would compromise [Defendant's] presumption of innocence."

Both the federal and state constitutions guarantee criminal defendants the right to a fair trial by an impartial jury.  *See State v. Davidson*, 509 S.W.3d 156, 193 (Tenn. 2016).  As part of that right, "[a] defendant is entitled to have his 'guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial.'"  *Id.* (quoting *Taylor v. Kentucky*, 436 U.S. 478, 485 (1978)).  The Tennessee Supreme Court has recognized that

> the trial court, which has presided over the proceedings, is in the best position to make determinations regarding how to achieve this primary purpose [of ensuring a fair trial], and absent some abuse of the trial court's discretion in marshalling the trial, an appellate court should not redetermine in retrospect and on a cold record how the case should have been better tried.

*Id*. at 194 (quoting *State v. Franklin*, 714 S.W.2d 252, 258 (Tenn. 1986)).

In *Holbrook v. Flynn*, 475 U.S. 560, 568 (1986), the United States Supreme Court held that, unlike requiring a defendant to be shackled or wear prison clothing, "the conspicuous, or at least noticeable, deployment of security personnel in a courtroom during trial" is not an inherently prejudicial practice and does not violate fundamental principles of due process.  As the Supreme Court explained:

> We do not minimize the threat that a roomful of uniformed and armed policemen might pose to a defendant's chances of receiving a fair trial.  But we simply cannot find an unacceptable risk of prejudice in the spectacle of four such officers quietly sitting in the first row of a courtroom's spectator section.  Even had the jurors been aware that the deployment of troopers

---

[8] Defendant does not challenge the "ankle stun cuff" on appeal.

was not common practice in [the trial court], we cannot believe that the use of the four troopers tended to brand [the defendant] in their eyes with an unmistakable mark of guilt. Four troopers are unlikely to have been taken as a sign of anything other than a normal official concern for the safety and order of the proceedings.

*Id*. at 571 (internal citations, quotations, and footnote omitted).

Defendant, relying on *State v. Robert Hood*, No. W2004-01678-CCA-R3-DD, 2005 WL 2219691, at *17-18 (Tenn. Crim. App. Sept. 13, 2005) (citing *Deck v. Missouri*, 544 U.S. 622, 632-33 (2005)), *perm. app. dismissed* (Tenn. Mar. 21, 2006), complains that the trial court failed to make any specific findings that the presence of additional security officers was necessary in this case. However, Defendant failed to include in the record on appeal the trial court's pre-trial order that addressed the need for additional security measures, to which the trial court alluded in ruling on Defendant's oral motion. Defendant has the burden "to prepare a record which conveys a fair, accurate and complete account of what transpired with respect to the issues forming the basis of the appeal." *State v. Ballard*, 855 S.W.2d 557, 560 (Tenn. 1993). Moreover, Defendant has failed to establish how the presence of additional deputies, who were dressed the same as the regular courtroom deputies, prejudiced the outcome of this trial. *See Robert Hood*, 2005 WL 2219691 at *18 (citing *State v. Taylor*, 771 S.W.2d 387, 396 (Tenn. 1989)). Thus, Defendant is not entitled to relief.

## *V. Evidentiary Rulings*

Defendant argues that the trial court erred in overruling his objections to certain questions asked by the State. Specifically, Defendant argues that the State improperly bolstered Codefendant Leach's testimony and vouched for his truthfulness by asking him if he was going to lie. Additionally, Defendant argues that the State improperly introduced evidence of the victim's character for peacefulness through several witnesses. The State responds that Defendant waived both issues for failing to cite to the record. Just like with the photographs discussed above, Defendant's citations to the record with regard to these questions, his objections, and the trial court's rulings are in his statement of the facts. Because Defendant's brief makes "appropriate references to the record" in support of these issues, *see* Tenn. Ct. Crim. App. R. 10(b), they are not waived due to an inadequate brief, and we will address them on the merits.

### *A. Bolstering of Codefendant's Testimony*

At the beginning of Codefendant Leach's testimony, the prosecutor asked several questions regarding the fact that Leach did not have a firm plea agreement with the State, that he understood that the State would offer him "something less than first-degree

murder" if "the State believe[d] [his] testimony ha[d] been truthful," and that he understood that testifying truthfully meant testifying consistently with his prior statement to police.[9] The prosecutor then asked the following question: "Are you going to say anything today, are you going to exaggerate, or tell any lies or do anything to make this man . . . . Are you going to lie about any of the things that you saw on December the 1st, 2015?" Defense counsel objected "to the form of the question" as being "tantamount to bolstering the witness's testimony." The trial court overruled the objection, stating "the State is simply asking him whether or not he will follow the oath that he [ha]s taken." During the motion for new trial hearing, the trial court found that "the State simply asked questions that credibility would allow them to ask: whether or not there was any bias, any motive, any reason for Mr. Leach to come to court and testify as he did."

As an initial matter, we note that although Defendant's appellate brief initially refers to this issue as improper "bolstering," that term generally refers to the use of a witness's prior consistent statement to enhance the witness's credibility. *See State v. Robert D. Walsh*, No. W1999-01473-CCA-R3-CD, 2001 WL 91949, at \*8 (Tenn. Crim. App. Jan. 30, 2001) (citing *State v. Hodge*, 989 S.W.2d 717, 725 (Tenn. Crim. App. 1998)), *perm. app. denied* (Tenn. June 4, 2001). Because no prior statement was introduced into evidence, a bolstering analysis is inapplicable. *Id*. Thus, Defendant's argument that the question asked by the prosecutor was improper because Leach's credibility had not yet been attacked on cross-examination is irrelevant.

The appropriate analysis, for which Defendant provides some legal analysis in his brief, is whether the prosecutor committed prosecutorial misconduct by vouching for the truthfulness of Leach's testimony. "Vouching" occurs when a prosecutor expresses a personal opinion that a witness is telling the truth. *See State v. Sexton*, 368 S.W.3d 371, 419-20 (Tenn. 2012). Though vouching generally occurs in the context of closing argument, *see id*., this Court has found improper vouching where a prosecutor's questions regarding a codefendant's plea agreement implied that the agreement was contingent upon the prosecutor's personal belief in the truthfulness of the testimony. *See State v. Foust*, 482 S.W.3d 20, 52 (Tenn. Crim. App. 2015); *but see Curtis Cecil Wayne Bolton v. State*, No. E2014-00559-CCA-R3-PC, 2015 WL 4557754, at \*16 (Tenn. Crim. App. July 29, 2015) (holding that while certain actions by a prosecutor may "inevitably . . . confer[] some indicia of the State's belief in [the witness's] testimony," there must be some "express statement of the prosecutor's personal belief in [the witness's] testimony" to be considered improper vouching), *no perm. app. filed*.

---

[9] The State may condition a codefendant's plea agreement on providing testimony consistent with a prior statement "so long as the testimony is required to be truthful." *State v. Bolden*, 979 S.W.2d 587, 591 (Tenn. 1998).

However, the only question to which Defendant objected at trial, and about which Defendant complains on appeal, was the question, "Are you going to lie[?]" Defendant has failed to offer any argument or analysis explaining how this question expresses the personal opinion of the prosecutor other than a conclusory statement that the question was improper because Leach's testimony had not yet been attacked on cross-examination, which as we stated above is irrelevant. Even if we do not consider the issue waived due to an inadequate argument under Tennessee Court of Criminal Appeals Rule 10(b), we fail to see how asking someone *whether* they are going to lie, which could be answered yes or no, is an expression of a belief that they are being truthful. Indeed, Tennessee Rule of Evidence 603 states that "[b]efore testifying, every witness shall be required to declare that the witness will testify truthfully by oath or affirmation[.]" This Court has noted that "the crux of Rule 603 is that the witness must be aware of and sensitive to the obligation to tell the truth under oath." *State v. Jackson*, 52 S.W.3d 661, 667 (Tenn. Crim. App. 2001). Defendant has failed to point us to any case, and our research has found none, that supports the proposition that a prosecutor's asking a witness whether he will comply with his oath to tell the truth constitutes improper vouching for the witness's credibility. *See State v. Frankie Ledbetter*, No. M2002-02125-CCA-R3-CD, 2003 WL 21877667, at *8 (Tenn. Crim. App. Aug. 7, 2003) (finding "without merit" defendant's argument that the trial court improperly vouched for truthfulness of child witness by asking if she "promised . . . [to] tell the truth to the jury"), *perm. app. denied* (Tenn. Dec. 29, 2003). Even if the prosecutor's question were somehow improper, Defendant has failed to even suggest that the question had a prejudicial effect on the outcome of his trial such that it would constitute reversible error. *See State v. Thornton*, 10 S.W.3d 229, 235 (Tenn. Crim. App. 1999). Defendant is not entitled to relief on this issue.

## B. Evidence of Victim's Character

During the testimony of Mr. Juarez, defense counsel objected when the prosecutor asked if Mr. Juarez had ever seen the victim be "mean" to other people. Acknowledging that he had not objected to similar testimony elicited from Ms. Juarez and Ms. Simpson regarding the victim's character, defense counsel argued that the line of questioning was "completely irrelevant." The prosecutor responded that "it's relevant as it goes to the victim's demeanor to be the primary aggressor, which would cause [Defendant] to act in self-defense. He has raised a self-defense theory." The trial court initially stated that self-defense had not been raised, only "discussed." The trial court then ruled as follows:

> Those questions, if self-defense is raised and something that the [c]ourt will consider charging, the [c]ourt has to charge this jury on first aggressor, as to who may have initiated, and part of the theory of first aggressor is whether or not the victim has a history of being a violent person as known to the Defendant.

So, these questions, [defense counsel], are relevant because - - it's not evidence, but it is relevant, and it has been raised, and the State has the right to put on the proof that Mr. Davis was not an aggressor, was not a violent person. So, that was raised by you.

During the hearing on the motion for new trial, the trial court found that the questions "not only go[] to his character, but [they] also go[] to rebut that image that had been painted that this man is out trying to buy drugs and trying to rob a drug dealer[.]"

Except under certain circumstances, evidence of a person's character is not admissible for the purpose of proving action in conformity with that trait on a particular occasion. Tenn. R. Evid. 404(a). One of those circumstances is that in a homicide prosecution, the State may offer evidence of the victim's character for peacefulness to rebut evidence that the victim was the first aggressor. Tenn. R. Evid. 404(a)(2). The Tennessee Supreme Court has held that under this rule, the State is "permitted to present evidence of the victim's good character to rebut defendant's suggestion that he killed the victim in self-defense." *State v. West*, 844 S.W.2d 144, 150 (Tenn. 1992). However, the fact that defense counsel referred to self-defense in opening statement and had not yet proffered any *evidence* to that effect does not allow the State to preemptively admit evidence of the victim's character for peacefulness. *See State v. Copenny*, 888 S.W.2d 450, 455 (Tenn. Crim. App. 1993); *cf. State v. Boris Terrell Traylor*, No. 01-C-019104-CC-00124, 1992 WL 14140, at *3 (Tenn. Crim. App. Jan. 31, 1992) ("Since opening statements by counsel are not evidence, there was simply nothing for the state to rebut[.]").

At the time the State admitted evidence of the victim's character for peacefulness, no evidence had been admitted suggesting that the victim was the first aggressor. The trial court erred in finding that the issue of self-defense had been raised by defense counsel's opening statement, which is not evidence. However, the admission of the evidence during the State's case-in-chief was harmless because the same evidence could have eventually been admitted after Defendant testified that the victim was the first aggressor. *See Copenny*, 888 S.W.2d at 455. The fact that the trial court subsequently determined that self-defense was not fairly raised by the proof such that the jury should be instructed on it does not affect whether the evidence of the victim's character was admissible under Rule 404(a)(2), which requires only that evidence have been presented suggesting that the victim may have been the first aggressor. Additionally, Defendant would be hard pressed to argue that only Mr. Juarez's testimony regarding the victim's character had such a prejudicial effect that he is entitled to a new trial when virtually identical testimony had already been admitted without objection during the testimony of Ms. Simpson and Ms. Juarez. Defendant fails to even suggest, much less establish, that he is entitled to plain error relief with regard to the testimony of Ms. Simpson and Ms. Juarez, including showing that "the issue was not waived for tactical reasons" and that

"consideration of the error is necessary to do substantial justice." *See State v. Minor*, 546 S.W.3d 59, 67 (Tenn. 2018). Therefore, Defendant is not entitled to relief on this issue.

## *VI. Discovery Violation*

On the fourth day of trial, Defendant filed a motion to exclude testimony regarding the ballistics testing conducted by the TBI on the ground that the State failed to promptly disclose the full ballistics report as part of discovery. During a hearing outside the presence of the jury, defense counsel alleged that despite the discovery request filed in 2016, the State had only provided one page of the nine-page report and that the full report was not provided until the third day of trial. The prosecutor responded that Ms. McWilliams's testimony that she had seen Defendant in possession of .9 millimeter and .38 caliber guns reminded him of the ballistics report showing that the bullet recovered from the victim was a .38 special caliber. The prosecutor contacted Dr. Warren, who no longer worked with the TBI at that time, about testifying on short notice. Dr. Warren requested a copy of "[his] report and [his] associated administrative materials, [his] case notes" to prepare for his testimony. The prosecutor forwarded the entire email communication, including the attached documents, to defense counsel. The prosecutor argued that the one-page official report that he intended to introduce into evidence had been provided to Defendant through discovery and that the remaining pages were "notes and work product." The prosecutor asserted that Defendant had not shown how the notes were material to the preparation of his defense given defense counsel's concession that Defendant shot the victim. The trial court found that only one page contained the official firearms report and that the additional pages contained work product and case notes, which the State was not obligated to produce. Additionally, the trial court found that "[t]here is nothing that is material in those peripheral documents that would affect [Defendant's] ability to get a fair trial." The trial court stated that the TBI "is not an agent of the State" and that Defendant could have issued a subpoena or spoken to Dr. Warren to obtain any additional materials or information he needed after reviewing the official report. The trial court denied Defendant's motion to exclude Dr. Warren's testimony.

Rule 16(a)(1)(G) of the Tennessee Rules of Criminal Procedure provides that the defendant is entitled to discover any "results or reports . . . of scientific tests or experiments" that are in the State's possession and which the State intends to use in its case-in-chief or are material to preparing a defense. The State is under a continuing duty to disclose evidence subject to the rules of discovery, and additional evidence discovered before or during trial shall be promptly disclosed. Tenn. R. Crim. P. 16(c). If the State fails to comply with a discovery request in a timely manner, the trial court has the discretion to fashion an appropriate remedy, taking into account whether the defendant has been prejudiced by the delayed disclosure. *State v. Smith*, 926 S.W.2d 267, 269-70 (Tenn. Crim. App. 1995). When arguing that the State violated its discovery obligations

under Rule 16, the defendant bears the burden of showing "the degree to which the impediments to discovery hindered trial preparation and defense at trial." *State v. Brown*, 836 S.W.2d 530, 548 (Tenn. 1992). The trial court should refrain from excluding evidence for noncompliance with discovery rules "except when it is shown that [the d]efendant is actually prejudiced by the [S]tate's failure and the prejudice cannot be otherwise eradicated." *State v. Payne*, 791 S.W.2d 10, 16 (Tenn. 1990).

As an initial matter, the trial court erred in stating that the TBI is not an agent of the State. The TBI is "the primary state criminal investigation agency," *State v. Jim Inman*, No. 03C01-9201-CR-00020, 1993 WL 483321, at *11 (Tenn. Crim. App. Nov. 23, 1993), *perm. app. denied* (Tenn. Apr, 4, 1994), and the forensic scientists who work for the TBI are "salaried state employees," *State v. Decosimo*, 555 S.W.3d 494, 497 (Tenn. 2018). If the Federal Bureau of Investigation (FBI) is considered a State agent when the State requests the FBI laboratory to conduct scientific tests, such that "reports in its possession are in the [S]tate's possession for the purposes of Rule 16[,]" *State v. Goodman*, 643 S.W.2d 375, 379 (Tenn. Crim. App. 1982), then certainly the same is true for reports of scientific tests conducted by the TBI. Thus, "the rules of discovery place[] an obligation on the prosecutor to disclose information in the possession of the TBI[.]" *State v. Jessica Kennedy*, No. E2013-00260-CCA-R3-CD, 2014 WL 3764178, at *71 (Tenn. Crim. App. July 30, 2014), *perm. app. denied* (Tenn. Dec. 16, 2014).

However, the State is not required to disclose "reports, memoranda, or other internal state documents made by the district attorney general or other state agents or law enforcement officers in connection with investigating or prosecuting the case," except to the extent required by Rule 16(a)(1)(G). Tenn. R. Crim. P. 16(a)(2). This includes an expert witness's "notes pertaining to the 'rough results' of his examination." *State v. Chico Lopez Chigano*, No. 1333, 1991 WL 188875, at *8 (Tenn. Crim. App. Sept. 26, 1991) (citing *State v. Irick*, 762 S.W.2d 121, 126 (Tenn. 1988)), *perm. app. denied* (Tenn. Mar. 23, 1992). Moreover, the Rule only requires the production of reports that the State intends to use in its case-in-chief or that are "material to preparing the defense." Tenn. R. Crim. P. 16(a)(1)(G)(iii). "In order to be material, the discoverable item must 'significantly help[] in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment and rebuttal.'" *State v. Thomas Dee Huskey*, No. E1999-00438-CCA-R3-CD, 2002 WL 1400059, at *59 (Tenn. Crim. App. June 28, 2002) (quoting *United States v. Gaddis*, 877 F.2d 605, 611 (7th Cir. 1989)), *perm. app. denied* (Tenn. Feb. 18, 2003). Defendant received the single-page "Official Firearms Report," which was signed by Dr. Warren and which was admitted into evidence at trial, during pre-trial discovery. The additional pages about which Defendant complains contain case notes, database search results, photographs, and a chain of custody report. Defendant has made absolutely no showing that any information contained in these pages was material to preparing his defense. Because Defendant received "all to which he was entitled in the way of discovery," *Irick*, 762 S.W.2d at 126,

the trial court did not err in finding that there had been no discovery violation and in denying Defendant's motion to exclude Dr. Warren's testimony and the evidence of the ballistics report.

*Conclusion*

Based upon the foregoing, we affirm the judgment of the trial court.

_____
TIMOTHY L. EASTER, JUDGE